**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| MOLLIE JOHNSON, | : | Case No. 1:20-cv-842 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| ROSS TOWNSHIP, et al., | : | |
| | : | |
| Defendants. | : | |

---

### ORDER GRANTING SUMMARY JUDGMENT IN PART AND TERMINATING CASE

---

After the COVID-19 pandemic began, the Ross Township Police Department had employees, each work day, record their temperatures in a logbook. Plaintiff Mollie Johnson, then a detective, noted that a coworker had an elevated temperature but was still at work. She called attention to the high temperature and the employee was sent home. When the employee returned to work before three full days had gone by, Johnson said something again. Her concerns led to a meeting with a police chief and police captain. That meeting went poorly. Johnson lost her job not long after.

Johnson brought suit under Title VII and Ohio law. After discovery, Defendants moved for summary judgment on all claims. For the reasons explained here, the Court **GRANTS IN PART** Defendants' motion for summary judgment (Doc. 43).

## FACTS

### A.  A High Temperature Creates Concern.

In April 2020, the COVID-19 pandemic was in its early stages.  The Ohio Department of Health and local boards of health were regularly issuing orders on social distancing, monitoring, staying home sick, and other restrictions meant to protect the public. (Bass Dep., Doc. 35, Pg. ID 273-79.)  Employers had to enforce these guidelines. (*Id.* at Pg. ID 275.)  Plaintiff Johnson's employer, the Ross Township Police Department, required employees to log their temperature when they came to work. (*Id.* at Pg. ID 386; Johnson Dep., Doc. 39, Pg. ID 1389-98.)

On April 23, after arriving to work, Auxiliary Officer Katelyn Lynch recorded her temperature in the temperature logbook as 100.6 degrees Fahrenheit.  (Answer, Doc. 6, ¶¶ 19, 20.) The next day, a Friday, Johnson noticed Officer Lynch's high temperature and reported it to Defendant Robert Bass, a Ross Township Administrator.  (*Id.* at ¶ 22.)  She also took a picture of Officer Lynch's temperature listed in the logbook.  (Johnson Dep., Doc. 39, Pg. ID 1391.)  She was concerned because the temperature was over 100.4 and she believed that Officer Lynch "had been in contact with somebody that was being quarantined for Covid."  (*Id.* at Pg. ID 1393-94.)

Bass spoke with Officer Lynch about her high temperature.  Officer Lynch explained she had an abscessed tooth and that is what had caused her fever the day before.  (Report, Doc. 35-30, Pg. ID 721.)  Her medication had reduced her fever.  She took her temperature again—it was 98.7 degrees Fahrenheit.  She was not wheezing, coughing, experiencing shortness of breath, or showing any other signs of having COVID-19.  (Bass

2

Dep., Doc. 35, Pg. ID 388-89.) It was Bass's understanding that a high temperature alone was not enough to conclude that someone had COVID. (*See id.* at Pg. ID 395-96.) So he allowed Officer Lynch to stay at the office. He told Johnson what he had decided. (*Id.* at Pg. ID 388-89.)

Johnson still had concerns. After Bass told her that the reason for Officer Lynch's high temperature was because of an abscessed tooth, Johnson looked up the Ohio Department of Health's guidelines. (Johnson Dep., Doc. 39, Pg. ID 1411-12.) She showed Bass what she found. He changed his mind and sent Officer Lynch home. (*Id.* at Pg. ID 1412-13.) That evening, Johnson called the health department and told them that an individual at her work had recorded a temperature of 100.6 degrees. (*Id.* at Pg. ID 1414-15.)

**B. A Meeting Breaks Down.**

Defendant Chief Burton Roberts got involved when Bass spoke with him about Officer Lynch. (Roberts Dep., Doc. 37, Pg. ID 961.) Officer Lynch eventually provided a doctor's note saying that she had a tooth infection, not COVID-19. Generally, an employee was supposed to stay home until she had been fever-free for 72 hours without medicine. But based on the doctor's note saying that Officer Lynch's fever was because of a tooth infection, Chief Roberts told her to return to work. So, having left work on a Friday, Officer Lynch returned to work on Sunday, April 26. This all happened before the 72-hour period had fully elapsed. (*Id.* at Pg. ID 963-64, 966.)

That Monday, April 27—the day after Officer Lynch returned to work—Johnson reported to work. She noticed that 72 hours had not passed since Officer Lynch first

reported her fever. (*Id.* at Pg. ID 966.) She also observed that it appeared the 100.6 temperature in the logbook had been changed to 100.0. (Johnson Dep., Doc. 39, Pg. ID 1399.) She took a picture of it. (*Id.*) She went to Bass and told him that the temperature logbook had been changed and that Officer Lynch had come back to work before the 72-hour period. (Roberts Dep., Doc. 37, Pg. ID 974.) Bass asked Chief Roberts to handle it. (*Id.* at Pg. ID 980-81.)

Chief Roberts called a meeting and asked Defendant Captain Patrick Carr to join him. (*Id.* at Pg. ID 981-82.) Roberts, as it turned out, had also spoken with a board of health the previous Friday. He testified that a board of health had told him it was "perfectly fine for Officer Lynch to come back to work." (*Id.* at Pg. ID 982.) He had explained the situation to them—an employee had presented with a fever based on an abscessed tooth but no other COVID-19-related symptoms—and asked if that meant she had to stay home. Everyone he spoke with (at least two people) said no. (*Id.* at Pg. ID 985-86.) He did not, however, tell them that Officer Lynch had possibly been exposed to COVID. (*Id.* at Pg. ID 987-89.) Chief Roberts shared this information with Capt. Carr and the two of them called Johnson in to the Chief's office to discuss her concern about Officer Lynch. (Answer, Doc. 6, ¶ 29; Roberts Dep., Doc. 37, Pg. ID 982.)

Johnson testified that she was "shot with questions." (Johnson Dep., Doc. 39, Pg. ID 1496.) She sensed that they "were angry that I had reported [the altered log] and the wrongdoings and policy breaking." (*Id.* at Pg. ID 1493.) They raised their voices; Carr yelled at her and clenched his teeth. Both grew "physically agitated." (*Id.* at Pg. ID 1496.) Capt. Carr testified that, for most of the conversation, he "had [his] face" in a file and that

4

the chief was the one conducting the conversation. (Carr Dep., Doc. 41, Pg. ID 1726.) He interjected to "ask one question" after Johnson mentioned calling the health department. (*Id.* at Pg. ID 1726-27.) He asked, twice, whether she had told the health department that Officer Lynch had an abscess or an infection, which may have caused the fever. (Roberts Dep., Doc. 37, Pg. ID 997-98; Carr Dep., Doc. 41, Pg. ID 1698, 1727.) She did not answer that question. (Roberts Dep., Doc. 37, Pg. ID 997-98.) She testified that she did not respond because she was fielding a lot of questions and she was focusing her answers to the chief. (Johnson Dep., Doc. 39, Pg. ID 1460-61.) But Capt. Carr testified that she ignored him. (Carr Dep., Doc. 41, Pg. ID 1727.) He asked the question again and this time he raised his voice. (*Id.* at Pg. ID 1729.) Not, he said, because she had contacted the health department, but because now she was being insubordinate. (*Id.* at Pg. ID 1727.)

Johnson felt it was "clearly a hostile environment" and "tried to put [her] hands up in defensive mode and go straight to the township administrator." (Johnson Dep., Doc. 39, Pg. ID 1496-97.) She left the office and headed for the township administrator's office to report their behavior, under a policy that applied in situations when "you're retaliated [against] or intimidated in a hostile environment"—in such situations, she was supposed to "immediately report [those instances of retaliation or intimidation] to the township administrator." (*Id.* at Pg. ID 1494, 1497.) But, she testified, Capt. Carr "physically put himself between [herself] and the administrator's door and tried to stop her." (*Id.* at Pg. ID 1497.)

Captain Carr does not deny that, when Johnson left the chief's office, he went too. They both ended up, according to Captain Carr, at the assistant township administrator's

office at around the same time. (Carr Dep., Doc. 41, Pg. ID 1732-33.) But Captain Carr denies that he blocked her or put his arm in front of her. He testified that the door was locked anyway. (*Id.* at Pg. ID 1733.)

Chief Roberts's report offers his perspective on what happened. He recorded that Captain Carr asked Johnson if she told the health department that Officer Lynch's elevated temperature was related to a tooth infection. Johnson did not answer. Captain Carr asked again. At that point, Johnson stood up from her chair and said "she was not dealing with this and left the office." (Ex. 30 to Roberts Dep., Doc. 37-17, Pg. ID 1290.) Captain Carr told her to sit back down. Johnson kept walking and left the office. Captain Carr went to the office of Laurie Kile, the Assistant Township Administrator. So did Johnson. Captain Carr told Johnson she "needed to separate herself from this situation" and return to the chief's office. (*Id.*) Johnson turned around and went back to her own office, "ignoring additional instructions from Capt. Carr to return to [Chief Roberts'] office." (*Id.*) In the section of the report recording Robert Bass's statement, he recorded that, when Johnson knocked on Kile's door, "Captain Carr pushed his way between her and the door and was yelling loudly" for her to return to the chief's office. (*Id.* at Pg. ID 1292.)

### C. A Detective is Fired.

After the meeting, Johnson was talking with a friend, Corrie Lives. (Johnson Dep., Doc. 39, Pg. ID 1429.) She told Corrie "how hostile and angry" Carr had been and "how he attacked" her. (*Id.* at Pg. ID 1430.) Corrie mentioned that someone had told her that Carr had a "use of force issue" while at another department. (*Id.*) It was Corrie's

6

understanding that Captain Carr left that department over that issue. (*Id.* at 1431-32.)
Johnson seems to have concluded that Captain Carr must have been given what is called
"A/B plan"—a situation in which the officer must either resign or be fired. (*Id.* at Pg. ID
1431-33.)

The next day, Johnson was at work with Chief Roberts and Captain Carr. (*Id.* at
Pg. ID 1434.) Bass and Kile, the administrator and assistant administrator, had left to
attend to other business. Johnson texted Bass asking if she could leave the office.
(Johnson Dep., Doc. 39, Pg. ID 1435.) She did not feel safe being alone with Chief Roberts
and Captain Carr. (Bass Dep., Doc. 35, Pg. ID 382.) She wrote, "I do not feel safe here
after their actions on Monday especially now that I've been told about the use of force
issue with a prisoner and the a/b plan Carr was given at Forest park." (Ex. 22 to Bass
Dep., Doc. 35-22, Pg. ID 707. *See also* Johnson Dep., Doc. 39, Pg. ID 1435; Ex. 30 to Bass
Dep., Doc. 35-30, Pg. ID 722-23.) She had not, however, confirmed that Captain Carr had
actually received an A/B plan. (Johnson Dep., Doc. 39, Pg. ID 1436-38.)

Bass told Johnson she could go home. Upon investigation, he learned that Captain
Carr was not given an A/B plan. (Decision and Entry, Doc. 15-1, Pg. ID 128.) Johnson
was placed on administrative leave on May 1, 2020. (Answer, Doc. 6, ¶ 35.) The Notice
of Charges advised Johnson that, during the April 27 meeting, she twice failed to answer
Captain Carr's question. Then she "stood up from the chair and stated she was not
dealing with this and left the office." (Ex. 19 to Bass Dep., Doc. 35-19, Pg. ID 695.) She
ignored Captain Carr's instructions to remain in the office. She then ignored him again
after they had left the office when he tried to have her return to the office to continue with

the meeting. (*Id.*) She faced nine charges of violations of the Ross Township Personnel Policy Manual. (*Id.* at Pg. ID 696-98.) After a public hearing, the board of trustees terminated her for insubordination. (Johnson Dep., Doc. 39, Pg. ID 1506.)

## LAW AND ANALYSIS

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court must grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to plumb the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element it has the burden to prove, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Johnson brings nine claims: (1) hostile work environment and sex discrimination under Title VII; (2) hostile work environment and sex and gender discrimination under

O.R.C. § 4112; (3) a whistleblower claim under O.R.C. § 4113.52; (4) violation of public policy; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; (7) retaliatory discharge/discrimination; (8) negligence; and (9) slander and defamation. Defendants jointly move for summary judgment on each claim.

**A. The official capacity claims against the individual defendants are dismissed.**

Johnson sued Chief Roberts, Bass, and Captain Carr in their official capacities. Defendants point out that such claims are actually against the township and argue that the Court should dismiss the official-capacity claims.

Official-capacity claims are generally just another way to sue the entity of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). When the target-entity is also sued, courts often dismiss redundant official-capacity claims against the agents of those offices. *Carter v. Delaware Cnty. Bd. of Comm'rs*, No. 2:07-CV-1189, 2009 WL 544907, at *14 (S.D. Ohio Mar. 3, 2009). That applies here, so the Court dismisses the official-capacity claims against Chief Roberts, Bass, and Captain Carr.

**B. Ross Township Police Department is not sui juris.**

Defendants argue that the Ross Township Police Department is not sui juris and must be dismissed. They are correct. The Ohio Revised Code, § 715.01, provides that "[e]ach municipal corporation is a body politic and corporate, which . . . [may] sue and be sued." Police departments, on the other hand, are sub-units of the municipalities they serve and not sui juris. *Jones v. Marcum*, 197 F. Supp. 2d 991, 997 (S.D. Ohio 2002). *See also* O.R.C. § 715.05; *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). Accordingly, the Ross Township Police Department is dismissed from this lawsuit.

**C. Gender-based hostile work environment (Counts 1 and 2).**

Johnson withdrew her Title VII claims against Chief Roberts, Bass, and Captain Carr, and the Court granted judgment on the pleadings as to those claims against those defendants. (Order, Doc. 52, Pg. ID 2225-26.) Thus, counts 1 and 2 are pending only against Ross Township Board of Trustees and Ross Township.

Title VII of the Civil Rights Act of 1964 makes it illegal for an employer to discriminate against an employee because of her sex. 42 U.S.C. § 2000e–2(a)(1). That includes creating conditions in the workplace that force an employee to work in a "discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986)). Thus, if a workplace is permeated by discriminatory intimidation, ridicule, and insult so severe or pervasive that it alters the employee's experience at work and creates an abusive working environment, an employer may face Title VII liability. *Id.* The same framework used to analyze Title VII discrimination claims applies to O.R.C. § 4112.02 discrimination claims. *Smith v. Bd. of Trustees Lakeland Cmty. Coll.*, 746 F. Supp. 2d 877, 893 (N.D. Ohio 2010).

Proving a hostile work environment claim requires a plaintiff to establish that (1) she was a member of the protected class; (2) she faced unwelcome harassment, based on her sex; (3) the harassment had the effect of unreasonably interfering with her work performance and created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer. *Warf v. U.S. Dep't of Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013). The standard for the third element is both objective and subjective: "the conduct must be severe or pervasive

10

enough to create an environment that a reasonable person would find hostile or abusive *and* the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (emphasis added). "[M]erely offensive" conduct is not enough. *Id.* at 21. Likewise, the "mere utterance" of words that hurt someone's feelings "does not sufficiently affect the conditions of employment to implicate Title VII." *Id.* at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

Other factors courts consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[H]arassing acts of a 'continual' nature are more likely to be deemed pervasive." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). The challenged behavior need not be sexually explicit. *Warf*, 713 F.3d at 878. In such cases, however, the plaintiff must show a but-for causative connection between her sex and the unlawful conduct she faced. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) ("To establish that the harm was 'based on her sex,'" a plaintiff must show that 'but for the fact of her sex, she would not have been the object of harassment"). "*Any* unequal treatment of an employee *that would not occur but for the employee's gender* may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment in violation of Title VII." *Id.* (emphasis original).

Defendants maintain that no evidence shows that their conduct was motivated by Johnson's gender. Rather, in their view, Chief Roberts and Captain Carr's conduct at the

meeting, and Johnson's eventual termination, were responses to her insubordination. They also contend that the complained-of conduct was not severe and pervasive.

After close review, the Court finds that Johnson has failed to make out a prima facie case of a hostile work environment. None of her arguments to the contrary succeeds.

*Gender.* First, Johnson cannot show that the reason for the unwelcome conduct was based on her gender. She argues that the differences in their physical size intimidated her and made her fearful. But this on its own does not mean their conduct was related to her gender. That same logic applies to two people of different physical stature but the same gender. This argument also falls out of joint with her own deposition testimony. When asked why she was terminated, she said it was in retaliation for reporting a wrongdoing, not because of her gender:

> Q: Why do you think you were terminated?
> A: I reported a wrongdoing. I don't know who did that wrongdoing but it was turned around against me.
> Q: Any other reasons?
> A: I was retaliated against because of reporting that. I don't know why. I don't know what their reasoning was.

(Johnson Dep., Doc. 39, Pg. ID 1513.) Thus, she has already conceded on the record that the reason for the adverse experience was not based on her gender. Accordingly, the record contains no evidence of sex-based bias. *Wiseman v. Whayne Supply Co.*, 359 F. Supp. 2d 579, 587 (W.D. Ky. 2004), *aff'd*, 123 F. App'x 699 (6th Cir. 2005).

*Preferential treatment.* Johnson also tries to draw an inference that, because she was disciplined but male employees were not, she experienced gender-based animus. She named several employees in her deposition, including Bass, Captain Carr, and Chief

Roberts. But her testimony reveals the emptiness of any comparisons between herself and her coworkers. No one she names was accused of insubordination, as she was. And her complaints about them revolved not so much on wrongs they had done but for which they were not disciplined, but rather on how she was treated following the temperature log incident. Of Bass: "he failed to do his job by protecting me" and by letting Captain Carr and Chief Roberts "get[] me in a room and putting me in fear for my safety." (Johnson Dep., Doc. 39, Pg. ID 1477-78.) Of Chief Roberts: she believes he was treated better than she was because he got away with "[d]iscrimination, harassment, retaliation, the codes of conduct" without being "retaliated against," referring to how he conducted the meeting. (*Id.* at Pg. ID 1485.) And of Carr: she claims he was treated better than her because he "was able to lie and be dishonest." (*Id.* at Pg. ID 1489.) She admitted, however, that she knew of no circumstance in which Captain Carr failed to follow a direct order from a supervisor. (*Id.* at Pg. ID 1490.) Most of what she said about her male coworkers had to do with her dissatisfaction with how they handled the temperature issue and the meeting she had with Chief Roberts and Captain Carr. And none of them acted insubordinately. So her discussion of other coworkers raises no inference of unlawful harassment based on her sex. *See Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

*Not severe and pervasive.* Lastly, Johnson cannot show that the alleged harassment was severe or pervasive. The conduct, by her own admission in her deposition, was not pervasive. She agreed that the only specific instance of a hostile work environment was the April 27 meeting with Chief Roberts and Captain Carr. (Johnson Dep., Doc. 39, Pg.

13

ID 1494-95.) She also admitted that she and Captain Carr rarely interacted. (*Id.* at Pg. ID 1498-99.) She "didn't work with Captain Carr a whole lot." (*Id.* at Pg. ID 1498.) And, except for the meeting on April 27, she never felt intimidated by Chief Roberts. He "kind of left me alone and let me do my own investigations, and they always kind of let me come and go as I wanted." (*Id.* at Pg. ID 1499.) Given the flexibility, she did not overlap much with either of them. (*Id.* at Pg. ID 1498-99.) What happened at the meeting was an isolated event, not a pervasive pattern of harassment. *See Williams v. CSX Transp. Co.*, 643 F.3d 502, 513 (6th Cir. 2011); *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008).

Because Johnson fails to make a prima facie case of hostile work environment, the Court **GRANTS** summary judgment in Defendants' favor on Counts 1 and 2.

### D. Retaliatory discharge/discrimination (Count 7)

Johnson also appears to argue that Defendants retaliated against her for sexual harassment. It is unclear under which law Johnson makes her claim. But because she cites Title VII case law, the Court will proceed on that ground. She must show that (1) she engaged in a protected activity; (2) the defendant knew of her exercise of that protected activity; (3) afterward, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 568 (6th Cir. 2019) (cleaned up).

Johnson does not attempt to make much of an argument that she makes her prima facie case. Barely developed legal arguments rarely fare well. It is well established that issues advanced in such a cursory fashion are not taken as fully invoked legal arguments.

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). In any event, she loses on causation because she fails to present material facts in dispute that would permit a reasonable jury to find that she was fired for anything other than insubordination.

As such, the Court **GRANTS** summary judgment on Count 7.

**E. The Court declines to exercise supplemental jurisdiction on state law claims.**

Johnson's remaining claims arise under state law: her whistleblower claim under O.R.C. § 4113.52 (Count 3); her claim that her termination violated public policy (Count 4); intentional infliction of emotional distress (Count 5); negligent infliction of emotional distress (Count 6); negligence (Count 8); and her state common law claim of slander and defamation[1] (Count 9). Title 28 U.S.C. § 1367 gives federal district courts circumscribed discretion to continue exercising subject matter jurisdiction over state law claims after dismissing federal claims. A court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which is has original jurisdiction." 28 U.S.C. § 1367(c). *See also Brooks v. Rothe*, No. 06-14939-BC, 2008 WL 114811, at *7 (E.D. Mich. Jan. 9, 2008). Usually, after the federal claims have gone away, the balance of factors—judicial economy, convenience, fairness, and comity—points toward declining to exercise supplemental jurisdiction over the remaining state law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, n. 7 (1988). *See also Brooks v.*

---

[1] With regard to the defamation claim, both sides support their arguments by citing to Ohio law. Under Ohio law, the tort of defamation occurs when a publication makes a false statement "made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008) (citation omitted). Because the parties treat this cause of action as arising under state law, the Court does likewise.

*Rothe*, 577 F.3d 701, 709 (6th Cir. 2009). Because the Court has granted summary judgment on all the claims over which it has original jurisdiction, it will decline to exercise supplemental jurisdiction over Johnson's state law claims. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** the state law claims (counts 3, 4, 5, 6, 8, and 9) for lack of subject matter jurisdiction.

**CONCLUSION**

For the reasons explained, the Court orders as follows:

(1) The Court **GRANTS IN PART** Defendant's motion for summary judgment and **DISMISSES WITH PREJUDICE** Counts 1, 2, and 7.

(2) The Court **DISMISSES WITHOUT PREJUDICE** Counts 3, 4, 5, 6, 8, and 9 for lack of subject matter jurisdiction.

(3) The Court **TERMINATES** this matter from its docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND